## WHEELER v. WHEELER.

1. **Divorce**: HABITUAL INTOXICATION. The extent to which intoxication must have become habitual, to constitute the foundation for an action for divorce, discussed.

2. ———: CRUEL TREATMENT. It is not essential that personal violence should have been used by a husband toward his wife to entitle her to a divorce on the ground of cruel and inhuman treatment: if danger is to be reasonably apprehended that is sufficient, and any course of conduct upon his part which would have the effect to impair her health constitutes legal cruelty.

*Appeal from Polk Circuit Court.*

SATURDAY, APRIL 24.

ACTION for a divorce, on the grounds that the defendant, since the marriage, had become addicted to "habitual drunkenness," and that he was guilty of such "inhuman treatment as to endanger the life of his wife." The prayer of the petition was granted, and the defendant appeals.

*Wishard & Read,* for appellant.

*L. G. Bannister,* for appellee.

SEEVERS, J.—At the time of the marriage, in 1859, the plaintiff was sixteen, and the defendant about thirty-one years of age. They resided for a time thereafter in Wisconsin, but for several years they have resided in Polk county, Iowa. The defendant testifies that he was

1. DIVORCE:
habitual
intoxication.

addicted to an excessive use of intoxicating liquors before his marriage; that on one or more occasions he was drunk, and that the plaintiff so knew. But we find, as a matter of fact, that he was not a habitual drunkard at the time of his marriage.

No permanent reformation of the admitted habit has taken place. We are warranted in saying, from the evidence, that the defendant for several years before the commencement of this action has been a steady drinker of intoxicating liquors, and has been frequently intoxicated, so that his condition could be observed in his walk and conversation. The defendant denies that he has been drunk during *business hours*, and in this he is corroborated by several witnesses. The evidence of the latter is of a negative character. Other witnesses testify to the contrary. Conceding it to be, however, as stated by the defendant, the denial of the evidence of the plaintiff in substance is confined to the business hours of the day. We are, therefore, forced to conclude that at other hours of the day and night the defendant has indulged in drinking liquor to excess. What constitutes an habitual drunkard, sufficient to warrant a divorce, has not to our knowledge been defined in this state. It is said to have been done in *Mahone v. Mahone*, 19 Cal., 627. In that case the jury were instructed, that the habit of intoxication must be such as to " completely disqualify the party from attending to his business avocations." This rule was said to be too stringent, and that if there is a " fixed habit of drinking to excess, to such a degree as to disqualify a person from attending to his business, during the principal portion of the time usually devoted to business, it is habitual intemperance." This definition was sufficient for the case in hand, but we do not understand it to have been held that nothing short of the standard fixed in that case would be.

It is not regarded as necessary to affirmatively define what constitutes " habitual drunkenness." We are not prepared to say, however, if a person has a fixed habit of drinking intoxi-

cating liquors to excess, is frequently drunk, that such is his normal condition during the night, and in hours not devoted to business, that his wife would not be entitled to a divorce.

We have said this much as to the defendant's unfortunate habit, because we think it was the primary cause of the difficulties between these parties, which has culminated in an appeal to the law for relief.

The ill-treatment contemplated by the statute is any course of "conduct that endangers, either apparently or in fact, the physical safety or health of the other, to a degree rendering it physically or mentally impracticable for the endangered party to discharge properly the duties imposed by the marriage." 1 Bishop M. & D., §·§ 717, 718.

2. ——: cruel treatment.

No two cases being alike, the real difficulty lies in the application of this rule. The plaintiff and her two daughters testify that the defendant time and time again called her foul and vulgar names, and accused her in coarse terms of a want of chastity, and on one or more occasions he came into her bed-room, looked under the bed and inquired what man was going to stay there that night, or whether the plaintiff had got through with that tramp yet. At one time he said "damn you, I'll show you what I want," and choked the plaintiff. At another he told plaintiff to keep "away from him so that he could not get his hands on her, or he would do something he would be sorry for all the days of his life. "Burt Lane was courting their daughter Ella, and afterward married her, and he was at the house of these parties on one occasion when the defendant came and locked the front door, and when he was ready to leave the plaintiff asked defendant for the key, and he refused to give it to her. He was then outside the house, and she raised the window and he said if she climbed out of the window he would "smash her head with a brick." He told the plaintiff on that or another occasion, in the presence of Ella, to "straddle" Lane. He wrote notes and left them about the house, in which he spoke of the plaintiff as Mrs. Lane and Mrs. Brewer, and intimating she was unchaste. In

a cross-petition he charged her with adultery with one Under-hill, his nephew, committed when the parties lived in Wisconsin. This charge was withdrawn, and we have doubts whether it was made in good faith, under the belief it was true. On one or more occasions he "jammed" the plaintiff against the door or side of the house.

If the plaintiff and her witnesses are to be believed his conduct on the 4th of July, 1877, showed a wanton disregard of her feelings and personal safety. There is serious conflict in the testimony as to this transaction. But the plaintiff's witnesses speak affirmatively of what they saw and heard; those of the defendant speak of the transaction negatively. If the truth be as the witnesses for the defendant say, the conduct of the defendant was such as to wound the feelings of the plaintiff, and tend to disgrace her before her neighbors, many of whom were present. The preponderance of the evidence is with the plaintiff as to the matters aforesaid, and we must regard them as established, although the defendant denies them. The excuse offered for the defendant is that he disliked to have his wife and daughter associate with the Lanes, and objected to the latter going with Burt Lane, but in this the defendant is contradicted by his daughter, who testifies he never forbade or opposed her going with Burt Lane. There is no evidence tending to show that the defendant had any ground for his fancied or real opposition to the Lanes. But admitting that in such a matter he must judge for himself, this gave him no right to call his wife foul names, abuse or accuse her of a want of chastity. It is said because the plaintiff persisted in associating with the Lanes, when the defendant objected to her so doing, she by her own conduct brought about the difficulties of which she now complains, and, therefore, this case is brought within the rule in *Knight v. Knight*, 31 Iowa, 451.

We are unable to find from the evidence that the foregoing proposition of fact is true, but if it were, there is a clear distinction between this and the case cited. The primary cause,

in our judgment, of the difficulties between these parties, as shown by the evidence, is the defendant's unfortunate habit. He is not naturally a bad man, but his normal character has become changed by the use of intoxicating liquors. This habit, as has been said, has become fixed, and there is no evidence tending to show even a desire to change it. When under the influence of liquor his conduct seems to have been systematic and persistent. No husband has a right to call his wife a " slut " or " whore," without cause or provocation. If he so does for a length of time, in the presence of their children, who are of an age to understand the meaning of such terms, and also in the presence of their neighbors and others, there can, it seems to us, be but one result, and that would be to grievously wound the feelings and utterly destroy his wife's peace of mind to such an extent as to impair her bodily health.

Much should be borne by either husband or wife before a resort is had to the law for a dissolution of the marital relation, but there must be a limit beyond which neither has the right to go. A man who persistently calls his wife a whore, or who does so whenever he may think the occasion demands it, has ceased to regard her as his wife, and is fast preparing himself to resort to even harsher measures to degrade her. Conceding it to be true the plaintiff may have been indiscreet, there is no evidence tending to show she is unchaste; she, therefore, must be regarded as a virtuous woman and wife, and imbued with the feelings of such. The treatment she received from the defendant was inhuman, because it was well calculated to impair her health and render her unfit to " discharge properly the duties imposed by the marriage."

There may be legal cruelty without evidence of actual personal violence. If " austerity of temper, petulence of manner, rudeness of language, a want of civil attention, occasional sallies of passion do threaten bodily harm, they amount to legal cruelty." *Beebe v. Beebe*, 10 Iowa, 133. Any course of conduct, therefore, which would have the effect to impair

health would be legal cruelty. Nor is it necessary that the party should wait until bodily harm has taken place. If there is danger to be reasonably apprehended, it is sufficient. *Caruthers v. Caruthers*, 13 Iowa, 266.

Taking into consideration the acts of personal violence, the foul language, and the defendant's unfortunate habit, we cannot but think the plaintiff is entitled to a divorce on the ground of inhuman treatment endangering her life.

Complaint is made of the amount allowed the plaintiff as alimony. There are but two children, one of whom is married, and the care and custody of the other was awarded to the plaintiff. The value of the property owned by these parties is, we think, at least fifty-five hundred dollars. The indebtedness of the plaintiff is said to be eleven hundred dollars for goods in his store, but he estimates the value of goods on hand at only one thousand dollars. We think one of these estimates is much depressed or the other greatly enlarged. There is no pretence that an invoice was taken, or an accurate account of the indebtedness made out. The mortgage on the Wisconsin land, we infer, was placed thereon since this action was commenced, and why it was done is not stated.

The plaintiff was allowed, in property, as we conclude from the weight of the evidence, fourteen hundred and fifty dollars, and two hundred and fifty dollars in money, or seventeen hundred dollars altogether. Taking into consideration the fact that the plaintiff is charged with the support of the only child, we are not disposed to reduce the amount allowed.

AFFIRMED.