JOSEPH M. KOVAR, Appellee, v. EMMA KOVAR, Appellant.

No. 46827.

FEBRUARY 5, 1946.

George C. Gorman, of Cedar Rapids, for appellant.

Fisher & Fisher, of Cedar Rapids, for appellee.

BLISS, C. J.—The record on this appeal presents a situation and circumstances quite difficult to believe were they not supported by convincing evidence. Plaintiff alleged in his petition, as amended, that his wife, the defendant, with-

out any just cause whatsoever, refused to live with him as a wife should and thereafter visited upon him numerous acts of cruel and inhuman treatment which impaired his health and endangered his life. More specifically he charged that his wife and daughter, in concert, and by the use of others, wrongfully brought about his commitment to the State Hospital for the Insane at Independence, and by unnecessarily increasing the hardships of his confinement and wrongfully opposing and delaying his parole and discharge thereby cruelly and unjustly mistreated him and unlawfully restrained him of his liberty.

Plaintiff and defendant were married January 8, 1908. They lived together without serious discord until 1936. One child, the daughter, Grace, born November 27, 1915, is the only issue of the marriage. At one time he owned three farms but lost them when the deflation of land values brought on financial difficulties. At the time of the trial in July 1945 he was sixty-nine years old. He had worked hard and in the years just following 1930 his health was impaired. The circulation of his blood, particularly in his lower limbs, was not good. His feet, ankles, and legs would swell. He was crippled with sciatic rheumatism. His wife claimed he had lost his sexual vigor. He had some skin trouble and a slight tremor of the hands and head from shaking palsy. In 1936 his wife fixed up a bed for him downstairs and thereafter they slept apart. He submitted to this under protest. His wife and daughter testified that he became irritable, quarrelsome, and faultfinding. On one occasion they said that he threatened, but did not strike, his wife with a butcher knife. His wife testified that at another time he put his fingers around her throat, and, with hate in his eyes, said that she should be under the ground. Although they are not in accord on the times of these threats, the daughter attempted to corroborate her mother.

The defendant has a maiden sister, Antoinette, by name. She was seventy-two years old, and a bedridden invalid. Defendant testified that her husband repeatedly took indecent liberties with, and made improper advances upon, this helpless, elderly sister-in-law. Antoinette was not a witness, but defendant, on direct examination, testified:

"Mr. Kovar had always been picking at this invalid sister of mine. Antoinette was sick in bed and my husband would go to her bedroom, tease in a way, get under the covers and act very indecent to her. At one time he wanted her to really have relations with him that weren't the proper thing; this was about a year before he was taken away. * * * The Court: Were you there when that happened? A. I was. Several times, not once."

On cross-examination she testified:

"* * * we generally went to my sister's home on Sunday and often we would go through the week, and about the first thing he did was to go to the bedroom there; my sister was then an invalid in bed; very often he had to be made leave the bedroom; that was the same period in which I noticed a falling off of my husband's sexual powers. * * * I saw these incidents in my sister's bedroom, not once but many times. * * * The Court: Did this many times in your presence, did he, Mrs. Kovar, while you were right there in the room? A. Yes; he—he had to be—very often he had to be led away from there, just made to go."

The daughter, Grace, also testified to these improprieties, going into considerable detail.

Speaking of these charges, the plaintiff testified:

"* * * no such incident ever occurred; I never at any time made any improper advances or attempted to improperly handle the person of my sister-in-law; the last time I saw her was Easter week of 1935, and have never been in her home since that time; I have since 1935 delivered articles to her home, but I never went into the house, I left them outside."

The able trial court, who heard and saw the wife and daughter as witnesses, found the testimony of plaintiff the more credible in all matters. Notwithstanding we lack these advantages of the trial court, we have no difficulty in reaching a definite conclusion respecting the testimony set out above. Standing alone this testimony of the defendant and the daugh-

ter is such that we would, indeed, be credulous to attach any weight to it, but when we consider it in the light of all of the testimony and of the entire record, and of the obvious animus and purpose which motivated their entire course of conduct in this matter, it wholly fails to carry any conviction of its truth. The factual matters above noted, and the additional claimed fact, asserted by the defendant, that her husband had a delusion that he was the equitable owner of his ten-acre home, constitute the basis for the charge that plaintiff was insane. We will hereinafter refer more particularly to this ''delusion.''

The daughter, Grace, after graduation from high school in 1933, entered the University of Iowa. She had received $1,000 from the estate of her father's father, which had been set aside for her education. She also in part worked her way through the University. She was graduated from the University and received a diploma for the completion of a course in ''social administration,'' on June 9, 1937. Immediately thereafter she participated in a social adjustment in the parental home. Plaintiff testified that she had always been a good girl and their relations were pleasant, but while in school, and, as he believed, at the instigation of her maternal aunts, her attitude toward him changed. She complained that he did not do more for her in a financial way. She spoke of him as a ''dumbbell.'' The ten-acre home had been acquired in 1932. It had a house upon it but most of it was timberland. It had few improvements. By his own labor and that of a hired man he built a barn 24 x 32 x 16 feet, with concrete walls and floor, a garage 20 x 25 feet, a story and a half, with concrete walls and insulated, with double sliding doors, a hog house 14 x 16 feet, with concrete walls and floor, and insulated, a hen house 20 x 40 feet, with concrete walls and floors, with heavy insulated roof. He cleared the timber off the land. He tiled it. He drained the basement of the house. He remodeled the house by putting in quarter-sawed oak in three rooms and additional windows. He cross-fenced the land. He set out an orchard of plums, cherries, apples, pears, peaches, and apricots of between five hundred and six hundred trees. He planted blackberries, raspberries, straw-

berries, gooseberries, and currants. He put in a grape vineyard. While the fruit trees were maturing he raised and sold garden truck. He said he furnished the money for all of these improvements. There is no denial of this. When Grace was graduated from the University he had eighteen hogs which he was getting ready for market. He had a horse, a cow, a Ford car, and the necessary tools and equipment to carry on his work. He had promising crops and was marketing fruit and vegetables. At once, upon her return from school, Grace and her mother insisted upon his going to the hospital at the University for treatment. He protested against this because it was not necessary, because the operation of the place needed his attention and labors, and because he could not afford the expense. They told him that they could have him cared for as a charity patient. He submitted finally. On June 11, 1937, two days after her graduation, Grace went with him to Iowa City and arranged for his entry into the general hospital (not the psychopathic hospital). Both returned to Cedar Rapids and on June 12, 1937, Grace swore to a complaint in the superior court of Linn county, which stated that her father ''is afflicted with some deformity or suffers from some malady which probably can be remedied by surgical or medical treatment or care in the hospital of the College of Medicine of the State University of Iowa; and that said patient is in the legal custody of Self and that neither said patient nor the person or persons having legal custody of him are able financially to pay for such surgical and medical treatment and hospital care.'' Grace procured the necessary order and on the same day returned to Iowa City. Exhibit 7 is a copy of proceedings of the Linn County Relief Department, essential to procure the plaintiff's acceptance as a charity patient in the University Hospital. The patient's entry was arranged for the 14th day of June 1937. Grace returned home and the plaintiff went alone to Iowa City and entered the general hospital on June 15th. Just what treatment, if any, he received, does not appear. He apparently went through the clinic. During the first week or ten days he was there the defendant, apparently without plaintiff's knowledge, made

two trips to the hospital. She saw Dr. A. L. Sahs, of the Department of Neurology, who was in charge of the patient, and supplemented · the "history" of the patient which had been given by Grace. On June 24, 1937, this doctor wrote Dr. John E. Stansbury, of Cedar Rapids, via the defendant. He stated in substance that he was sending her to the doctor "relative to further plans for Mr. Kovar. Mr. Joseph Kovar has been under observation since June 15th," and whose "history" was that he had undergone a change in his personality and the relatives were afraid of him; that examinations showed him to be defective in memory and insight; there have been minor examples "of the irritability *which has been so pronounced at home.* He is rather apathetic to most of the examinations, and has been rather suspicious of his wife, and her relatives, although there have been no definite evidences of hallucinations nor delusions. * * * the physical findings are largely those of generalized arteriosclerosis, including cerebral. * * * Our diagnosis is cerebral arteriosclerosis with psychosis." The letter continues with the statement . that he is referring Mrs. Kovar to the doctor·"for your assistance in having Mr. Kovar placed in a suitable institution so that he cannot harm himself or others." He suggested the Linn County Home if they took such cases and "can supervise him somewhat *and are empowered to keep him there even if he demands his release.*" If this arrangement was not possible he suggested that he be committed to the state hospital for the insane at Independence. "I will send you a more complete report at the earliest possible opportunity, and will wait to hear from you or Mrs. Kovar before we release him from the hospital." (Italics ours.)

That it was never the intention of the defendant and Grace· that Mr. Kovar was to be sent to the hospital to have "some deformity" or "some malady" "remedied by surgical or medical treatment and care" is evident from the fact that the defendant never waited for the doctor's "more complete report." The letter of the doctor also tends to show that was not their purpose. On June 29, 1937, the defendant and her daughter went to the office of the clerk of the district court of Linn county, where the defendant swore to and filed an in-

formation of insanity stating that the plaintiff was insane and a fit subject for custody and treatment in the hospital for the insane. On the same day a warrant for plaintiff's arrest was issued by the clerk to the sheriff commanding him to bring the plaintiff before the commissioners of insanity. This warrant was delivered to the sheriff, as shown by his return thereon, on June 30, 1937. According to the testimony of defendant, she had arranged with the sheriff to hold the warrant and not execute it until directed to do so by the defendant.

It appears that the defendant had no thought of permitting the warrant to remain unexecuted very long. For, in Exhibit 7, the Linn County Relief Office record in the matter of Mr. Kovar, referred to above, is this entry:

"6-30-37 Mrs. Kovar had requested arrangements for transportation for Mr. Kovar from the University Hospitals to Cedar Rapids. Mrs. Kovar, by phone, was advised that she would be expected to make arrangements for his return through the assistance of friends or by applying to the University Hospitals for return transportation. The clerk of the court was advised of our conversation with Mrs. Kovar."

On this trial the defendant testified that it was only after her husband's return home, and when it appeared after he was at home several days that he had not improved, that she filed the information of insanity. It was only after the court, who had the information and the warrant with return of service thereon before him, had interrogated defendant that she reluctantly admitted that her testimony was not true.

On July 24, 1937, Dr. Sahs wrote Dr. Stansbury his more complete report on the plaintiff. While the diagnosis was "arteriosclerosis cerebral, with psychosis, senile tremor, traumatic cataract on the right eye, progressive muscular atrophy," no mention is made of any conduct on his part or mental disturbance indicating insanity or unsoundness of mind. No such words are in the report nor is a condition noted requiring his incarceration or hospitalization in an insane asylum. Indeed, the letter states:

"The patient's behavior on the ward was not consistent

with that which was reported at home. He was agreeable and cooperative in every way. This behavior, however, does not preclude a relapse upon his return home. If such should occur the measures suggested in my letter of June 24th should be put into effect."

His physical condition, as reported, other than the tremor of the hands and head, was not bad for one of his age. His speech was tremulous, his voice rather high-pitched; there was a moderate furrowing of the tongue; there was some wasting of the chest muscles, and the muscles of his hands, legs, and in the pelvic region were weak; the deep reflexes were absent; there was evidence of emphysema (air in the interstices of the tissues); sensation was normal; the spine was rigid; the prostate slightly enlarged; the urine, blood count, blood Wassermann and Kahn, spinal fluid examinations, blood chemistry, were all normal; mild atrophic spine changes were consistent with one of his age; blood bromide studies were negative; the department of urology reported a mild prostatism. The letter stated that the patient had been dismissed on July 22, 1937, apparently without notice to the defendant, for, according to plaintiff's testimony, he was neither expected nor welcome on his return home. He came home in a hospital bus. He said:

"When I arrived at my home, Mrs. Kovar was there at the house. She said what are you doing here, you are not to come here. I said, well, they brought me here. The driver got out and handed her a book to sign as a receipt he brought me home, which she refused to sign. [Defendant denied this.] The driver then drove away. That was July 22nd. I then stayed at home until the afternoon of August 6, 1937, during which time there was so much to do that I just simply went to work; there was stuff to be cleaned, the berries and vegetables and all, and I did all I could. I had 18 head of hogs, poultry, a horse and a cow. During that period I made arrangements for the marketing of the hogs, I was watching the market and it was still going up. On August 6th I wrote a card to one Bedecker, with whom I made arrangements to haul these hogs off for me when I was ready; I wrote it at noon that day, left it on the dresser and went with the hired man

to clean the berries, thinking that toward evening when I got tired I would take the card down and mail it. It was a hot day and I came to the house to get a drink and when I was there the sheriff came with a summons and charged insanity. * * * Prior to June 1937 I was managing a farm that belonged to various members of the Kriz family, I was executor of the estate of the father of my wife and Antoinette Kriz, and as such executor by arrangement with the heirs I was handling and managing that farm from about 1930 down to 1937. Some discussion arose between me and my wife and her sister Antoinette in reference to changing tenants on that farm in the year 1937. I told my wife that I was out to the farm and was going to rent it to a tenant; she said you have no business out there at that farm and she was going to fix it so I would never go out there again, that conversation was on August 5, 1937, the day before I was picked up by the sheriff and taken to jail. * * * The sheriff took me with him at that time to the county jail, that was August 6th; I stayed in jail until about one o'clock the next day. After I was taken to the county jail by the sheriff, I asked the privilege of making contact with friends, or attorneys. On the following day, August 7, 1937, I was taken to the courthouse for a hearing. I had no conversation with George Buresh [an attorney] on August 6th, or with any member of my family or any other person * * * before the time of the hearing at the courthouse. I saw Mr. Buresh present at the hearing, but had no opportunity to talk with him before that. No doctor talked with me after my arrest and before I went to the hearing. * * * The officers, my wife, my daughter, Mr. Buresh, and myself were the only people present at the hearing. After the hearing, Mr. Buresh came and talked to me. This conversation with Mr. Buresh was at the doorway in the same room in which Mrs. Kovar was at that time. I told Mr. Buresh I wanted to get him yesterday but I didn't. He said, well, don't worry I will try to get you out. I said, it is too late now but I want to call Rev. Helmich up, I want to talk to him and he promised. After the hearing I was returned to the jail, and Mr. Helmich came with me. He was the pastor of the church I belonged to.''

The minister remained with him until the sheriff took him that evening to the hospital for the insane at Independence. The hearing was one in name only. No testimony was taken; no questions were asked of plaintiff. No one spoke for him. The members of the commission were strangers to him. None of them spoke to him or examined him. The commission had before them the two letters of Dr. Sahs, above referred to. The expedition, the informality, the casualness of the whole proceeding, the utter indifference to the rights of a citizen, who, so far as shown, had never harmed anyone, yet, within scarcely more than twenty-four hours could be taken from his labors, his home, arrested, jailed, committed, and whisked away to an insane asylum, are, to express it mildly, shockingly startling. It is not strange, though hardly symptomatic of mental unsoundness, that when his wife and daughter and the hands of men had seemingly turned against him, he sought the aid and the comfort of a higher power.

Plaintiff had courted his wife-to-be for a considerable time before they were wed. They looked for a little home. He purchased one at 342 Rockford Avenue, in Cedar Rapids, and received deed therefor to himself as grantee on November 21, 1908, which was recorded on November 27, 1908. He testified that he fully paid for it with his own money, and that neither his fiancée nor her parents contributed anything toward the purchase. It was never mortgaged. Plaintiff testified:

"I knew that my wife was receiving a wedding present from her parents, but not one penny of her money went into the purchase of this house on Rockford Road. I am not mistaken about this. * * * I paid the whole consideration which was $2,300 cash. * * * I took the money out of the Blairstown Bank and paid it. I think it was by check. I do not have the check at this time. If anybody says my wife received a wedding present from her parents that was put into this home, they are mistaken. All she got as a present from home was furniture. Her folks bought the furniture."

The defendant testified that her parents gave her a wedding present of $2,000, which she gave to her husband, out of which probably $150 was used to purchase furniture. After

their marriage in January following, they occupied the Rockford Avenue property as a home, almost continuously until November 20, 1932. In that year he made a deal with a Mr. Colton for the ten-acre tract, which was priced at $6,250. To pay for it he turned in his Rockford Avenue property at $3,000. The balance was paid by a cash payment of $2,250 furnished by Antoinette Kriz. Plaintiff paid the remainder by his check for $1,000 on the American Trust and Savings Bank of Cedar Rapids. The family moved into the new home on December 4, 1932. Plaintiff testified that Mrs. Kovar was present when the transaction was closed and that it was agreed that Antoinette was to get the same rate of interest which she was receiving from the bank. The interest, according to the plaintiff, was paid by delivering wood and other produce from the acreage to Antoinette. Plaintiff paid the taxes at all times on the home until he was taken to Independence. Defendant testified it was the agreement with Antoinette that the payment of the taxes should be considered as satisfying the interest charge. Plaintiff denied this and testified that he paid the taxes on the property because he was the owner. When the exchange and sale of the properties was consummated, Colton and wife delivered their warranty deed to the acreage to Antoinette Kriz as grantee. The deed bears date of November 18, 1932, and was recorded November 28, 1932. Just why title was taken in Antoinette is not explained in the record further than she held it simply as security. Plaintiff testified that he was the owner of the property and that Antoinette simply held the title in trust for him. No claim is made that Antoinette had any other interest. It appears in the record that the plaintiff and defendant had been sued on their $2,000 note in February 1932, by the executrix of an estate, and on November 4, 1932, the court authorized the executrix to settle the indebtedness on payment of $100 and the court costs.

The following testimony of plaintiff appears to sustain his contentions, to wit:

"At that time [the closing of the Colton exchange] nothing was said about Miss Kriz executing a deed to the property. Later a deed was executed by Miss Kriz. I was present when it was executed. George Buresh prepared the deed and asked

me to go with his stenographer, who was a notary public, down to Antoinette Kriz' house because she seldom left home. Antoinette Kriz signed the deed, the notary notarized it and took it back to the office. I took the notary down and back. Mr. Buresh said he was going to hold it in escrow for both parties. · Whenever I paid the loan off or made any settlement with Antoinette Kriz he would record the deed. Conveyances of the Rockford Road property and the Johnson Avenue property [the ten-acre tract] were prepared and executed in George Buresh's office. My wife was present. Mr. Buresh prepared the papers for execution at my request."

There was no denial by any witness of any of this testimony. Mr. Buresh was and is a lawyer in the active practice in Cedar Rapids. It cannot fairly be said under the record that plaintiff's assertions that he had a valuable equity in this property were hallucinations and delusions. The "history" of plaintiff, as given by defendant and her daughter to the doctors, public officers, and other persons whom they contacted in their endeavor to commit and keep him in the hospital at Independence, is not established by the record herein, although those·contacted would have had difficulty in refuting it.

The physical and mental condition and the conduct of plaintiff from his reception in the hospital at Independence to March 20, 1940, are shown in a letter of that date written by Dr. R. A. Stewart, superintendent of the hospital, to wit: On admission he had *moderate* hypertension, his systolic blood pressure being *160* accompanied by a *moderate* hardening of the arteries; senile cataracts, loss of reflex in the pupils; marked tremor of the head and hands from shaking palsy:

"The mental summary upon admission is to the effect that the patient was oriented as to year, month, day, and place, recognized his surroundings as well as the physicians. His memory was good for general information. He was also quite good at calculations. No hallucinations or delusions were elicited, but he did admit that he had been quite irritable and faultfinding during the past two years."

He denied that he ever struck or threatened to strike his wife

and said that his sister-in-law had quarreled with him and his wife had ceased to care for him:

"Since this man has been a patient here he has really given us no trouble whatever, and at the present time he is living in our quietest ward. The door of this ward stands open from morning until 9 o'clock at night in the summertime and 8 o'clock in the wintertime. Mr. Kovar does only light work on account of his age and Paralysis Agitans [shaking palsy]. The work consists of tidying up the ward and assisting in serving all the meals * * * the passive tremor of his head and hands has become much more marked." In conversation today for over an hour, "I was impressed by the fact that he appeared to become excitable and a little irritable when discussing his home situation. He also appeared to be suspicious and a little inclined to be quarrelsome." He stated that he had been "trapped by his wife when she sent him up here. * * * In my opinion, the correct diagnosis of this man is Psychosis with Paralysis Agitans [shaking palsy]. I say this because there is no marked loss of memory and no emotional instability, but there is present a suspicious, excitable state which usually does develop in cases of Paralysis Agitans. The condition will no doubt be progressive. It is unfortunate there is no cure for Paralysis Agitans."

The above statement was prepared for the district court of Linn county, one of whose judges, upon the application of friends of plaintiff, had appointed a commission to interview the plaintiff at the Independence Hospital and report to the court. It will be noted that the report of the superintendent mentions a *moderate* hardening of the arteries only, a blood pressure not much above normal for the plaintiff's age. It is common knowledge that most persons over fifty years old have arteriosclerosis in some degree, and yet are not subjects for hospitalization for insanity. Cerebral arteriosclerosis is not mentioned in this report. It is quite common knowledge to those acquainted with persons afflicted with shaking palsy that their memories and mentalities are not ordinarily impaired, nor are they subject to mental or emotional disturbance. The fact that plaintiff showed irrita-

tion in discussing his family appears to have been the re-action of a normal man in the light of this record.

The above-mentioned commission appointed by a district court judge consisted of a lawyer, a minister, and a doctor. They spent part of the afternoon of March 19, 1940, interviewing the plaintiff at the hospital at Independence and examining its records concerning him and talking with the superintendent about him. While each of the laymen deferred somewhat to the doctor member because of his training and experience in his profession, each of them expressed himself as definitely of the opinion that the plaintiff was not insane. Using as his guide and measure "the yardstick of how people in general behave and conduct themselves," the lawyer commissioner reported that he was at a loss to know whether a person who is senile in any degree whatsoever was by reason thereof insane and subject to confinement in a hospital for the insane:

"Proceeding, however, from other angles such as a personal interview with the subject, his letters written to various people, etc., it would seem that the subject was fairly well balanced. A real estate transaction in which the subject was involved seems to be largely the basis for his commitment, and it is certainly a fertile ground for contention * * * To say that there was no merit to his contention would be in my opinion at least debatable and the records show that the subject was committed because of some idea he had that he owns or had an interest in some property.

"The superintendent of the hospital seemed to be of the opinion that as long as a man's wife saw fit to have him confined in the hospital as a humanitarian act, that it should not be disturbed by others, but this Commissioner is not convinced that this was the motive and it would seem that such sympathy should superinduce more personal attention and periods of visitation than has been accounted for at the State Hospital especially in view of the apparent ability of the subject to talk logically and his apparent pleasing personality."

The commissioner reported that the subject indicated no inclination to retaliate against those who he felt had un-

justly committed him to the institution, nor did he detect any bitterness or hatred for anyone. In conclusion, this commissioner stated:

"If it were mandatory for me to report definitely on the subject, I would have to say I observed no signs of insanity about the man from comparing his conduct with others not confined in an institution."

The minister commissioner reported:

"It is a matter of interest that in looking over the records I discovered a notation of a request from Mrs. Kovar that no ministers be allowed to interview her husband. * * * The basis for judging him to be insane seemed to be fourfold. First—his quarrelsomeness and irritability, but the attendants at the hospital report that he is well behaved and good dispositioned, and my impression was that he was of a quite amicable temperament and on this score as far as I could observe, there is no ground at the present time for saying he was insane.

"Secondly it has been charged that he has delusions regarding the possession of property. Investigation of the records in regard to the exchange of property seem to indicate that Mr. Kovar had reason to believe that he did possess considerable property.

"In the third place, it was mentioned that he had a spotty memory, but our discussion revealed that he had a very good memory for dates concerning events that have happened within the last few years, and I would consider his memory to be at least average.

"In the fourth place, it was asserted that in response to the question as to his wife's fidelity, he made an equivocal answer, and thus indicated that he was not normal in his reactions, but this Commissioner feels that under the circumstances his answer was the only one that could be expected and does not indicate an unbalanced mind."

The question and answer above referred to appear in a letter of the superintendent to the county clerk, dated July 14, 1939, to wit:

"When I spoke to him recently about his wife and whether he had ever had any reason to feel that she stepped out on him, he replied, 'I have always believed that it was a wise thing not to discuss any [such] matter whether you believed it to be true or not.' I will let you make your own deductions from his statement."

We agree with the minister's comment. The plaintiff answered what he thought was an impertinent question without giving either offense or information. It was certainly not evidence of a sclerotic cerebrum.

In concluding his report to the court, the minister stated:

"His attitude regarding his own fate seems to be commendable. He has indicated that if freed he will institute no proceedings against anyone nor seek to gain any kind of redress. * * * I personally feel that he is not now in a mental condition justifying his further commitment."

The doctor commissioner noted that a proper investigation in the matter required more than just one conference with the above-named person, and that during the interview he answered all questions intelligently so far as could be determined at the time and was co-operative throughout the whole time. His conclusions were apparently based largely on clinical data revealed by examinations in the hospital records, and upon information obtained from the defendant, which under the record before us is of doubtful verity—notably the statement that she visited him on several occasions, when in fact she never saw him in seven years and eleven months, and that her letters showed she was concerned about his welfare, when the record is definitely to the contrary, and that he had but a $500 equity in the home place. His conclusion was arteriosclerosis with pyschosis.

The court found that plaintiff had not proved his sanity.

Previously, on July 10, 1939, the superintendent had written the county clerk that in the spring he had written Mrs. Kovar about the parole of her husband, and that:

"She replied she did not think he should leave the hospital in view of the disturbing factors that had been brought

to bear on him recently. She did not feel he could be trusted to keep his promises on being paroled, *and therefore nothing more was done in Mr. Kovar's case.* [Italics ours.] * * * If not too much trouble, I would thank you to investigate the home situation in this case very carefully and write me your candid opinion as to whether his wife no longer is interested in him, or if his ideas against his wife and his wife's relatives are all delusions.''

On July 13, 1939, the commissioners of insanity of Linn county answered the letter of the superintendent and said they ''had a meeting with this patient's wife and daughter this morning and they feel that it would be a mistake to discharge him at this time * * * for the reason that he has apparently been suffering from hallucinations or delusions.'' All investigations were limited to an inquiry of the wife and daughter as to their wishes, and when ascertained, that was the end of the matter. Mrs. Kovar's ability to work her will upon the superintendent and to secure his compliance with her every request, notwithstanding it was plainly against the welfare of her husband, is astounding.

Mrs. Kovar and the superintendent carried on quite a correspondence. Her letters are not in the record but the nature in part of some of them can be quite definitely inferred from the answers of the superintendent. She and her daughter visited the hospital shortly after plaintiff's incarceration, but after she told the superintendent of their discord at home he thought it best that she not visit with him. The daughter did see him. The defendant never saw the plaintiff from August 7, 1937, until the trial in this case beginning on July 10, 1945. She never made any attempt to see him. She wrote him a few letters in the early weeks of his confinement. The superintendent had written her on August 13, 1937, that ''He does not seem to express any resentment to members of his family so it might be all right to send him a letter occasionally.''

It appears that the defendant was being criticised for committing her husband to the hospital at Independence. The widow of the Reverend Helmich, the pastor of the church

which plaintiff and defendant attended for many years down to 1937, was a witness for plaintiff. She testified that about the time of the commitment Mrs. Kovar telephoned her that she had some nice tomatoes for her. The witness testified:

"I answered her that I didn't receive any gifts from anybody that can do what Mrs. Kovar did to her husband. * * * Up to the time that Mr. Kovar was taken to Independence I was the best friend of Mrs. Kovar and her sisters, but since that time I have never spoken a word to either one of them."

Letters of the superintendent to defendant indicate that she had protested against her husband's writing letters generally. Under date of August 24, 1937, at which time plaintiff had been in the hospital but seventeen days, the superintendent wrote defendant:

"I am in receipt of your letter of August 21st in which you report the few things Mr. Kovar has arranged for in his letters which have gone out from this institution. Some of those letters were written in Bohemian and were hard for us to censor them, but because he was quite cheerful *and apparently had good possession of his mental faculties,* we mailed them out. *As long as he is causing you this amount of confusion and trouble by mailing these letters, we will not mail any letters except to you. We will either hold the other letters here until you shall call for them or mail them to you to do with as you see fit. If you so desire, we can merely consign them to the waste basket if you will write a reply to us stating that such is what you wish.* I note what you say about how he is *trickiest when he is the quietest and most congenial. We will watch him accordingly. We are sorry that sending out these letters has caused you any inconvenience.*" (Italics ours.)

Mrs. Kovar was the object of the superintendent's solicitude, rather than the patient who had been consigned to his care. She was pleased with the success of her plans. On August 28, 1937, the superintendent wrote her:

"I *am glad* that the arrangements I am now making

for Mr. Kovar's outgoing mail are satisfactory with you, *and will see that he does not slip any out on the side if possible.* He complains off and on about his sciatica although it is observed that the sciatica does not bother him as much as he would like to have us think it does.'' (Italics ours.)

Mr. Stepanek, a baker, who had known the Kovars since 1911, was a witness for him. He saw the plaintiff just before he was sent to Independence. He testified:

''* * * we had quite a chat and visit; from observation I thought he was the same old Joe I knew 25 years before, and seemed to be perfectly ordinary in every way. Within about a year after Mr. Kovar was sent to Independence I went with Frank Doupnik, who is dead now, and Reverend Zadovsky to see Mrs. Kovar, at which time there were present Mrs. Kovar, her daughter Grace and Miss Antoinette and Mary Kriz, another sister; I heard the conversation * * * well, Reverend Zadovsky was appointed spokesman because we thought he being a preacher he would have a Christian spirit * * * before I consented to go with them I asked Mr. Doupnik and Mr. Zadovsky who came from Independence shortly before that, what the condition of Joe M. Kovar was, because I didn't want to get into something that I couldn't answer with a clear conscience. And they told me that— especially Frank Doupnik told me that he is sure that there is absolutely no foundation for Joe Kovar being in Independence. When we got there in the evening all were at home, and Mr. Zadovsky made a nice Christian appeal to Mrs. Kovar to consent for her husband to be released from Independence, Mrs. Kovar flatly and positively refused.''

When the witness, who had known Grace since she was a baby, remonstrated with her, she replied:

''Mr. Stepanek, let me take care of my own affairs.''

The intercession of his friends merely added to the misfortune of the plaintiff. On September 8, 1938, the superintendent wrote to Mrs. Kovar:

''We note you are being annoyed by three men who are

demanding that he be taken home. We regret this annoyance but do not know of anything that we can do about the matter. I would suggest that you ignore them, and I am sure that they will not make any particular trouble for you. *We can assure you that we will carry out your written instructions that no one can visit him outside of his immediate family.*" (Italics ours.)

It is not an exaggeration to say that, with respect to the control of the plaintiff, Mrs. Emma Kovar was, in effect, the superintendent of the State Hospital for the Insane at Independence, Iowa, rather than Dr. R. A. Stewart.

Mr. Dvorak and wife, old friends of the Kovars, went to Independence to see the plaintiff. He testified:

"* * * we stopped at the office and inquired about seeing him and they refused us permission to see him; in walking around the grounds we saw Mr. Kovar sitting in the lawn swing. He came up to us and as we were talking I told him we weren't permitted to see him, he then said he had better not talk to us because he might get in trouble and he walked back to the swing."

Apparently after the Reverend Zadovsky's visit to the hospital, "Mrs. Kovar requested that no ministers be allowed to interview her husband," as the Reverend Rodney C. Gould, the minister commissioner noted in the hospital records. Then, by "written instructions," all visitors were barred except the "immediate family," which scarcely used the privilege. He was permitted to write to his old friends and acquaintances—all that he wished to—but the letters were delivered to the wastebasket, or more likely to Mrs. Kovar for her information, while he waited for the replies that never came, and no doubt sadly thought that even his old friends had forsaken him. And yet defendant argues strenuously that cruel and inhuman treatment was not proven, and that if it was, there was no proof that it endangered his life or health.

On May 17, 1940, the commissioners of insanity and the superintendent of the hospital recommended the parole of

the plaintiff. The superintendent's recommendation was conditioned on the restrictions set out below. It was a very restricted parole. Henry Niemeier of Walker, accepted his custody, and agreed that he would not permit him to visit his home, or interfere with defendant's sisters in any way, and that he would keep him under his direct supervision and personal custody at all times, and if he attempted to leave the premises unaccompanied he would return him at once to the state hospital at Independence.

Grace testified that after the parole she and her husband protested to the superintendent that she and her mother were opposed to the parole, and that the superintendent agreed with them in this. Plaintiff afterward was paroled to two other persons, under the same restrictive conditions. Neither the defendant nor her daughter ever saw or communicated with plaintiff during the entire period of his parole, from June 5, 1940, to December 23, 1944, when the superintendent "discharged him as recovered." Though they knew and talked with two of his custodians, they never made any inquiry concerning him. During his incarceration and parole neither ever gave him any money or aided him. About the end of his parole he received old-age assistance from the state. Defendant testified that it was at her request that the parole was conditioned that her husband should not come near her or see or communicate with her under penalty of violating his parole.

The superintendent did not inform the defendant of her husband's discharge as recovered until he wrote her quite an illuminating letter on January 4, 1945, in reply to her inquiry of the day before. He stated that friends had agreed that they would see that Kovar would never come to want and that: "he does not bother you. I hope and trust that this agreement will be kept. Of course, if the agreement is not kept and he does annoy you or make any threats toward you, *your recourse would be to again file information against him with your county clerk.*" (Italics ours.)

The plan for the future was to be in strict accord with the old pattern. Sane or insane, the threat of reincarceration at Independence was to be held over the head of Kovar. If

defendant was annoyed by anything he did, recourse was not to be had to the peace officers and courts provided by statute, but to the commissioners of insanity of Linn county.

The trial court in its findings of fact and opinion reviewed the case at length with vigorous comment. It stated:

"It fairly appears to this Court from the evidence that not only was Mr. Kovar committed to the insane asylum upon the complaint of the defendant and at her option, and upon a showing of insanity which was sketchy at the best, but that he was completely at her mercy after he was incarcerated there. * * * The entire record seems to this Court to indicate that plaintiff had become a nuisance and a detriment to defendant, that she was no longer interested in him or his welfare, and was concerned solely with keeping him out of her way. The plaintiff was sixty-one years old at the time of his commitment; he is now sixty-nine. He spent about seven and one-half years there in strict confinement in the State Hospital or under a parole which very much restricted his freedom of movement and action. And for much of this it seems to this Court that defendant was responsible. Her attitude was clearly one of indifference toward the plaintiff after she had had him incarcerated. * * * In the mind of this Court it is a terrible thing that the things could happen to a citizen of the United States which have happened to the plaintiff. It can be understood why the defendant exercised these powers as she did; it is not so easy to comprehend why she was given such powers. Use them she did, however, and in a way which shocks the conscience of this Court."

We are in full accord with the conclusions of the trial court. The grounds for divorce alleged were established beyond question. It is difficult to conceive of cruelty so merciless, mercenary, and unsated. There are hurts more cruel and devastating to the well-being of mind and body than physical blows. There was direct evidence that plaintiff's health was impaired and his physical disabilities were aggravated in the years between his commitment and discharge and it is a reasonable inference that the mistreatment he received was the cause.

We find no divorce cases in Iowa or elsewhere in which the facts are similar to the facts in this case. It is quite in a class by itself. But numerous decisions sustain the decree of the trial court. Any deliberately wrongful course of conduct persisted in which would have the effect to impair health and endanger and shorten life is cruel and inhuman treatment within the scope and intent of the statutory grounds for divorce. Precedents are ordinarily of little value because there is such variation in the facts. The evidence for plaintiff is of much greater weight than is found in many of our cases in which the divorce for cruel and inhuman treatment has been upheld. See Littleton v. Littleton, 233 Iowa 1020, 10 N. W. 2d 57; Robbins v. Robbins, 234 Iowa 650, 12 N. W. 2d 564; Thompson v. Thompson, 186 Iowa 1066, 173 N. W. 55, 5 A. L. R. 710; Massie v. Massie, 202 Iowa 1311, 1312, 210 N. W. 431; Dillavou v. Dillavou, 235 Iowa 634, 637, 17 N. W. 2d 393, 394; Lewis v. Lewis, 235 Iowa 693, 699, 17 N. W. 2d 407, 410; Wheeler v. Wheeler, 53 Iowa 511, 515, 516, 5 N. W. 689, 36 Am. Rep. 240; Klepper v. Klepper, 234 Iowa 1138, 1141, 15 N. W. 2d 213. In a number of the cases cited the rule is stated that we attach much weight to the trial court's findings of fact.

It is our conclusion that the decree should be and it is— Affirmed.

All JUSTICES concur.