LUCILLE HYLARIDES, appellant, v. GERRIT H. HYLARIDES, appellee.

No. 48934.

(Reported in 76 N.W.2d 779)

MAY 9, 1956.

Freeman G. Merrill, of Sheldon, for appellant.

Smith & Griff, of Primghar, for appellee.

SMITH, J. — I. The statutory language "inhuman treatment endangering life" may have been originally intended to be strictly construed to mean conduct threatening immediate

violent extinction. Common usage however has given it a more rational and realistic interpretation. Courts recognize that a course of marital conduct without actual violence on the part of one member of a couple may be such as gradually to wear down and destroy the life of the other in a manner more painful and cruel than mere physical torture would cause.

We realize, however, the rule in such cases must be administered cautiously and with discrimination to avoid abuse and the lowering of standards. Iowa law is not designed to promote "easy" divorces. In an early day it was cautioned: "Courts are admonished * * * that divorces should not be decreed except for 'grave and weighty causes.'" Knight v. Knight, 31 Iowa 451, 456. The seriousness of mental cruelty, or rather the serious effect of mental cruelty, is more easily simulated (consciously or unconsciously) and correspondingly harder to appraise than is the effect of physical violence. We are convinced however there was no such simulation in the instant case.

These meditations are suggested by the problem here presented first to the trial court, and now passed on to us. The trial court found plaintiff had established most of the cruel conduct specified in her pleadings and that "although there has not been a full and complete corroboration of all points * * * there has been * * * a sufficient amount for such purposes."

The decision in the trial court however is based on a further finding that plaintiff has failed to establish "any fear of the defendant or inability to protect herself in any physical contact" or "any showing of such a sensitive nature or of such rare and cultural rearing as to in itself without physical acts make the language, ill temper, and verbal misdemeanors of the defendant constitute sufficient cruel and inhuman treatment." Plaintiff appeals from the adverse decision based on the latter finding.

That seems to be the crucial point in the case. The case may be deemed close but we have concluded the trial court leaned unnecessarily backward in a conscientious effort to preserve the protections the statute places over the marriage status. Had it been a default case the divorce would probably have been granted in most courts without question. The fact that defendant employed counsel and with his mother attended the trial without

offering any testimony to disprove the really serious charges made against him tends to support the finding that they were established and sufficiently corroborated.

II. The brief characterization the trial court gives these charges—"language, ill temper and verbal misdemeanors", "lack of parental affection", etc.—is hardly adequate to convey the appalling picture presented by the record.

The parties were married June 30, 1947, and the present case was commenced January 17, 1955. It came to trial July 6, 1955, when the son, Larry Joe, was six years old. There had been a couple of times when the parties did not live together, the final separation being in September 1951.

They had moved eight times in four years, due largely to defendant's careless and indifferent neglect of his family duties. One landlord testifies: "I offered him (defendant) employment * * *. I wanted him to help us pull corn out of the soybeans and he said he would, and then he didn't show up. The next day I asked him to show up and he didn't do it * * *. I knew he was not working, otherwise I would not have asked him." The witness says defendant left $75 unpaid on the rent which has not been paid. He also testifies he told plaintiff "it was just for her I left them there that long."

Another landlord who was to have received his pay in work testifies: "I offered him employment on a number of occasions but I do not recall on how many * * *. He worked for me about a day and a half * * * and another day and a half he cut weeds. On other occasions he did not refuse; he just didn't come to work or he would not." He says plaintiff "worked for my wife and my wife took Gerrit's place in the field."

The sheriff of O'Brien County tells of speaking to defendant "at the request of his parents who were both to see me. They requested that I talk to Gerrit and see if I couldn't talk him into going to work and support his family * * *." He says defendant was living alone on one occasion and "as I recall it I got there about nine o'clock and he was still in bed. I do not recall that Gerrit made any excuse for his failure to work and support his family."

There is no slightest hint in the record that defendant was

incapacitated or that there was any physical reason for his distaste of work as a personal habit.

Plaintiff's own testimony on direct examination occupies thirty-four pages of the record and her cross-examination in question-and-answer form some twenty-eight more. It is not practicable nor necessary to set it out at length. It reveals a sordid story, mostly of matters trivial, if considered individually, but formidable as a whole. It includes a disclosure of cruel and inconsiderate conduct in sexual matters and arm-twisting and more subtle misconduct in other family matters—all difficult of corroboration but undenied though related in defendant's own presence.

His unfriendly or at least indifferent and unfeeling attitude toward his son as related by plaintiff is corroborated by plaintiff's sister and brother-in-law. The latter testifies defendant, when asked about the birth of his son, said: "It was just like a cow having a calf." The witness however says "She had a terrible time." And plaintiff herself testifies the doctor told her if she had not been a strong girl she would not have survived.

Plaintiff's sister says that Gerrit, in her presence, once told plaintiff "You just better get rid of that child; I don't want any kids for awhile." That was shortly after plaintiff became pregnant. The sister also testifies Gerrit "just more or less made fun of the marriage (between plaintiff and defendant)." Plaintiff also testifies when she first told her husband she was going to have a baby he said "Get rid of it." She adds "He said that all during my pregnancy and I held that in mind. It was hard for me to go on from there to know the child wasn't wanted, and yet it was coming. I didn't want to get rid of it. I would never think of such a thing."

Plaintiff tells of Gerrit's physical treatment of her during her pregnancy: "* * * sometimes during the night he would jolt me with his elbow, or push me against the wall. He was very rough with me. He didn't like the idea that I was going to have a child." And after the baby came and Gerrit found it was a boy "he more or less shoved it aside. He didn't care to even look at it and later didn't pay too much attention to it."

Plaintiff's father, after a lingering illness, died of cancer.

Defendant objected to her going to care for him. "A lot of the time I walked close to a mile and a half * * * with my suitcase. It was during the winter and if he would see me he would just pass me up, and then when I came home he would let me walk home again."

On another occasion her father needed a blood transfusion. "Of course, Gerrit wouldn't go at first, but in the end he went; * * *. We were all supposed to donate blood for my father, and in the last minute Gerrit backed out, he wouldn't give blood."

At another time Gerrit and his mother had an argument in plaintiff's presence when she (his mother) asked him to go to work: "He refused and grabbed hold of her arm. I was afraid he would break her arm and I finally got in between them and tried to separate them." His mother said: " 'Just let him kill me if he wants to.' "

Plaintiff once went to the mailbox and found a letter addressed to her husband. It was from a girl in Sibley and appears as an exhibit in the record, dated November 24, 1950:

"Dearest, Gerrit, Where have you been keeping yourself. I was home real early Sat. waiting for you when you called and said you weren't coming then I walked up town all alone in the dark and then I was ready on Wed. night and you still didn't show up. (Undependable, even in his amours!) And I wanted to see you so bad before Friday morning." Then follows reference to a suggested later date and she adds: "Let me know if you do come and be sure to keep your word or you won't get no Christmas present from me?"

After some apparently innocuous chitchat the letter was signed "Your Sweetheart, Freda." When plaintiff's brother-in-law charged him with it, "He got pretty mad about it * * * and was about ready to fight. Finally he just cooled off." Plaintiff says: "I didn't know what to do to know he had been seeing this girl when I was helping my mother, and I had an awful hard job to carry on * * * it was very hard on my nerves."

Plaintiff left defendant permanently the following September when Larry was about two years old. The separation apparently did not alter plaintiff's friendly relationship with defend-

ant's parents: "Since the separation from Gerrit, I have helped the Hylarides on other occasions. I have helped with chores. I did that for her. She was always good to me. * * * I helped Mrs. Hylarides pick chickens. We did a lot of work together. Several times she helped me with quite a number of chickens that we had to dress out * * * she helped us folks a lot."

We have tried to set out enough of the record to give a fair idea of the cruel treatment endured by plaintiff at the hands of this lazy, irresponsible and indifferent husband. Our attempt has necessarily been inadequate. We are abidingly convinced however that she made a courageous and honest attempt, under great difficulties, to make a success of their marriage.

III. The one possible doubt in the case is the one pointed out by the trial court: Did defendant's inexcusable conduct endanger plaintiff's life? That it was "cruel and inhuman" is beyond question. Any doubt as to the adequacy of the physical cruelty to endanger plaintiff's life must be due to her own physical strength and courage to endure and resist.

But there was much more than physical mistreatment. We think there is adequate showing in plaintiff's testimony that she was becoming seriously nervous under it. She consulted a doctor who gave her medicine for some gall bladder trouble and thought maybe she "should have another child." But when she explained the marital situation "of course, then he knew why I was feeling the way I did."

She testifies her nerves have improved since the separation but she still feels upset when Gerrit is around. When asked if she "could go back and live with Gerrit again" she replied: "I feel it is just useless. I have tried * * * my best; I have gone back to him before and then things didn't get any better, in fact they got worse. * * * It would be a mockery of marriage."

Both plaintiff's sister and brother-in-law testify as to the effect upon plaintiff wrought by her life with defendant. Mr. Den Hartog says:

"I knew Lucille before her marriage and I thought she was in good health at that time. To my knowledge she was not nervous * * *. After she had been married * * * for some time she got more nervous, and * * * she just seemed on edge. We saw

her every now and then and you could tell the change. I think she has settled down now since she has been separated." Mrs. Den Hartog's testimony is to the same effect, "* * * she was terribly nervous when he (Gerrit) was around."

Defendant's attitude toward their son, prospective and subsequent to his birth, must have been in itself a poignant form of cruelty to a wife and devoted mother. The court might almost take judicial notice of its inevitable effect upon both mother and child.

Plaintiff's brother-in-law says: "Gerrit never paid much attention to the child as far as I could see. Sometimes Gerrit would come up to the child and just push him aside. He wouldn't play with him or anything; he would just ignore him."

We have set out more of the testimony than we originally intended, perhaps more than is necessary. But the lives of both plaintiff and her child were imperiled, under the record; and since we are disagreeing with the trial court it seems fair that we do not unduly conceal the record upon which we act.

Plaintiff's own restraint in expression testifies to a greater degree of innate sensitivity and culture than the trial court found. She was apparently fair and just but reserved. Her lack of ability to describe her own reactions is apparent but her testimony does reveal a character and ability not dependent on education.

IV. We realize factual precedents are not too practicable nor necessarily conclusive. They may however elicit the general principles involved. That there may be such cruel and inhuman treatment as to endanger life even without any physical violence is thoroughly established. Massie v. Massie, 202 Iowa 1311, 210 N.W. 431, citing: Doolittle v. Doolittle, 78 Iowa 691, 43 N.W. 616, 6 L. R. A. 187; Hullinger v. Hullinger, 133 Iowa 269, 110 N.W. 470; Rader v. Rader, 136 Iowa 223, 113 N.W. 817; Hickman v. Hickman, 188 Iowa 697, 176 N.W. 698, 14 A. L. R. 929; Anderson v. Anderson, 189 Iowa 95, 174 N.W. 665; Dabelstein v. Dabelstein, 191 Iowa 808, 183 N.W. 385; and Inman v. Inman, 196 Iowa 845, 195 N.W. 583.

In Harnett v. Harnett, 55 Iowa 45, 46, 7 N.W. 394, 395, we said, in a case showing some violent acts and much indolence:

"If, aside from these acts, the defendant had manifested a proper disposition toward the plaintiff, we should be inclined to think that the acts were not such as to entitle the plaintiff to relief. Perhaps, indeed, we might come to the conclusion that the action could not be maintained * * * if he had not failed so signally to furnish suitable food and clothing. * * * In our opinion such destitution must tend directly to the impairment of health and the shortening of life * * *."

In Low v. Low, 232 Iowa 1114, 7 N.W.2d 367, we reversed the trial court and granted plaintiff-wife a divorce notwithstanding a total want of any physical violence, but upon a showing of cruel treatment of another sort including failure to furnish maintenance, and of coarse and careless conduct causing a nervous condition and breakdown.

The authorities reveal a variety of fact situations defying condensation and classification. We think the record here shows a situation that demands relief for this wife and child whose lives would be endangered by the unbelievable conduct and neglect of defendant.

The plaintiff is entitled to a divorce and the custody of her minor child. While an order requiring defendant to pay support money and awarding him some visiting privileges may be meaningless under present conditions, such order should be included in the decree.

The case is reversed and remanded for a decree granting plaintiff a divorce, the custody of the minor son, Larry Joe Hylarides, and an order requiring defendant to pay $30 into the hands of the Clerk of the District Court on the first day of each month, same to be turned over to plaintiff for the support, maintenance and education of such child till he attains the age of eighteen years; also permitting defendant the right to visit said son at such time and place and for such duration as the trial court may find proper, upon such further hearing as said court may deem necessary.—Reversed and remanded.

All JUSTICES concur.