JEAN M. BOWLES, appellee, v. WILLIAM D. BOWLES, JR., appellant.

No. 49145.

(Reported in 81 N.W.2d 15)

FEBRUARY 5, 1957.

REHEARING DENIED MAY 10, 1957.

John F. Davis, of Des Moines, for appellant.

Cosson, Stevens, Hauge & Cosson, of Des Moines, for appellee.

THOMPSON, J.—If termination by divorce is attempted by a party dissatisfied with his, or her, marital bargain, it must be done as prescribed by our divorce statutes. Divorce having been the method sought by the plaintiff in her petition in the instant case, it was incumbent upon her to demonstrate her right to the relief asked by bringing herself and her marital troubles within the terms of section 598.8, Code of Iowa 1954; and since she alleges only cruel and inhuman treatment such as to endanger her life her proof must meet the test set up by paragraph 5 of the last cited section. We quote the pertinent parts of section 598.8, supra:

"Divorces from the bonds of matrimony may be decreed against the husband for the following causes: * * *

"5. When he is guilty of such inhuman treatment as to endanger the life of his wife."

It will be noted that the part of the statute here material, paragraph 5, divides into two parts: There must be cruel and inhuman treatment, and it must be such as to endanger the life of the wife. If either of these elements is lacking there can be

no divorce. In point of fact, the question most mooted in our decisions is the second requirement of danger to life. A multitude of cases have discussed and determined whether certain conduct, usually of the husband, has endangered or is reasonably calculated to endanger, the life of one of the wedded parties. Yet the considerable numbers of decisions have done little to clarify the matter; in fact, it is perhaps fair to say that they have only added to the confusion. This arises from the nature of things marital. No two cases are identical on their facts. The differences between married persons and the treatments they accord each other are as varied as human nature itself. So precedents are generally of little value. The law is well established; but its application to the facts of each case is often a problem. of the utmost difficulty. We have found no identical case in relation to the one now before us. So it has become necessary to study the record in this cause with little aid from precedent. The facts shown here must speak for themselves.

I. The parties to this action were married in August 1944. At this time the defendant was in training in the air force as a bombardier-navigator. Upon completion of his training he went overseas in the spring of 1945, returning later in the same year. He was stationed for a time at Sioux Falls, South Dakota, then discharged. In the fall of 1945 the couple moved to Iowa City, where the defendant completed his college work, receiving a collegiate degree in 1946 and a Master's degree in 1947. They then returned to Des Moines and lived for about four months with the plaintiff's parents, Mr. and Mrs. C. C. McGrew. Later in the same year they lived for about six weeks in the home of Mrs. Alice Allen, and in January 1948 they rented a house at 2500 Fortieth Street in Des Moines, where they lived for about four years. A son, Billy, was born to them on February 11, 1948.

In March 1948 the defendant went to Chicago for training with a market research firm, and was there, except for week-end visits with his family, for about seven months. In October 1948 he returned to Des Moines and secured employment as a salesman for the Commerce Clearing House, in which he continued at least to the time of the trial. A second child, Sally, was born in late 1951 or early 1952. In November of 1951 they purchased

the property at Thirty-sixth Street and Hickman Road in which they continued to reside until their separation and the equity in which was awarded to the plaintiff by the trial court.

II. The course of true love, it is said, does not run smoothly; and much less, it seems, does married life. The "mountain men" of the early days in the West knew a difficulty which they named "cabin fever." This was a common development when two men were shut up in a cabin for the winter with no place to go and no one to see or talk with but each other. Strong dislikes often arose; they "got on each other's nerves" and soon neither could endure the sight or sound of the other. It would be going much too far to say that this same malady afflicts married couples in such a virulent form. Yet it does appear that the strain and wear and tear of daily living together often cause irritations that lead to rudeness and bickerings. The problem of the courts is to determine whether these things: quarrels, harsh words, ill-considered and inconsiderate accusations, add up to such cruelty as to endanger life. Particularly is this true in such a case as the one before us, where there is no claim of any physical abuse and no substantial evidence of any threats of physical attack.

█ █ That conduct of one party to a marriage may amount to such cruel and inhuman treatment as to endanger life even though there is no physical mistreatment is established by repeated decisions of this court. Our latest pronouncement on this point is Hylarides v. Hylarides, 247 Iowa 841, 76 N.W.2d 779. Numerous other cases to the same effect could be cited. It is also without question that in this class of cases, where the credibility of the witnesses is often an important consideration, we give weight to the fact findings of the trial court. Levis v. Levis, 243 Iowa 574, 52 N.W.2d 509; Massie v. Massie, 202 Iowa 1311, 210 N.W. 431; Pooley v. Pooley, 178 Iowa 19, 157 N.W. 129. We shall apply these rules to the case before us in determining whether the plaintiff has made a sufficient showing of such cruelty as to endanger her life so as to require an award of a divorce.

█ Her complaints are numerous, and it will not be possible to detail all of them in the proper space of an opinion. Many of them are tales of discourtesies and lack of consideration. Thus.

she says that when she was driving the family car from Des Moines to South Dakota in 1945, to join the defendant, a tire blew out and the car went into a ditch. When she called the defendant to tell him of the mishap, he was concerned with the damage to the automobile but asked nothing about her own condition. He wanted to go out or to have company come in every evening, and when she demurred he told her she was anti-social. When he was about to graduate from the State University her parents came to Iowa City to attend the exercises, but he refused to tell her or them where the ceremony would be held. When they were about to stay with her parents for a time he said: "We have to be stuck out in the sticks." He was irritable and criticized the food and sometimes left the table without eating. He criticized her for paying ninety cents for a ball of yarn for mending. He would come home in the middle of the day when she was pregnant and resting and tell her to get up and get to work. He refused to help care for the children. When she had injured her knee and asked him to wash the dishes he refused. He admitted association with another woman. (This allegation is vague and is denied by the defendant.) When she had not arranged for some social activity in the evening, he said: "Another boring evening at home, I'll have to stay around and look at you."

There was a difference of opinion as to the purchase of a home, and the defendant often brought up his criticism of her views on this point. When plaintiff would say "Good morning, isn't this a beautiful morning?" he would say "What's so good about it, and this is a horrible looking egg." He called her a "witch" and "stupid." He refused to go to a marriage counselor, although he did go to consult a psychiatrist. After the separation he insisted upon coming to the home. On one occasion he rearranged the furniture in the television room so that only one adult and two children could find seats to view the programs. He was continually ill-tempered and critical of her. She "didn't know what he might do, and was afraid of him." He wrote her a critical letter from Chicago, complaining of her supposed lack of diligence in sending his laundry and a check. He complained of the manner in which she laundered his shirts.

Perhaps the point most labored and relied upon concerns the charge made by the defendant in his answer that plaintiff had "become infatuated with another man." In this connection it appears that defendant entertained strong suspicions that plaintiff was too much interested in a friend of defendant whom he had brought to the house on several occasions. He asked a neighboring couple if they had seen a grey Chevrolet automobile parked near his home and to advise him if they did see such a car there. He accused the plaintiff of meeting this man in a tavern and of communicating with him. At one time he became embroiled in a somewhat halfhearted fistic encounter with the alleged corespondent. The trial court held that these allegations of infatuation amounted to cruel and inhuman conduct and warranted the granting of a divorce. We are unable to agree.

■ Plaintiff cites several cases in which we have held that unjustified charges of misconduct with a third party may amount to such cruelty as to require a divorce. These are: Worthington v. Worthington, 238 Iowa 1044, 1047, 29 N.W.2d 186 (repeated charges of infidelity, including a statement in the answer); Heath v. Heath, 222 Iowa 660, 661, 269 N.W. 761 (a charge that the wife was pregnant by another man at the time of marriage); Blazek v. Blazek, 216 Iowa 775, 777, 249 N.W. 199 (defendant repeatedly charged plaintiff with infidelity and said he was not the father of her children); Williges v. Williges, 215 Iowa 960, 962, 247 N.W. 222 (defendant in his cross-petition alleged plaintiff had communicated to him a venereal disease); McClurg v. McClurg, 207 Iowa 271, 272, 222 N.W. 862 (a charge of improper relations between the wife and another man); Massie v. Massie, supra, 202 Iowa 1311, 1315, 210 N.W. 431 (defendant accused plaintiff of immorality and called her a "whore"); and Anderson v. Anderson, 189 Iowa 95, 101, 174 N.W. 665 (defendant's cross-petition charged plaintiff with adultery with persons unknown). It will be observed that in each case the charge went much further than a mere accusation of infatuation with a third party. It is true that in McClurg v. McClurg, supra, this court said that intimations of unchastity may be sufficient to constitute cruelty. What these intimations may be is not defined. It appears that the defendant had talked with the church elders about his wife's supposed misconduct.

Defendant's denial that he had "charged" his wife with unchastity seems to have been directed to some formal charge, as before the church authorities. In any event, we do not regard the defendant's allegations here as intimating unchastity to the plaintiff. He was disturbed—needlessly so, perhaps—by the thought that she had become interested in another man to the point of infatuation; but infatuation does not mean unchastity or adultery.

Nor do we think there is evidence that this particular charge of infatuation endangered the plaintiff's health. She testifies that her health has improved greatly since a restraining order which prevented her husband coming to the house was issued. She says there has been a great change in her mental attitude; that she is far happier and less nervous. This, it must be remembered, has been with the pleaded charge of "infatuation" contained in the defendant's answer a matter of public record. In fact, as we read the entire testimony of the plaintiff, it seems evident that her claim of cruelty is based chiefly upon the day-to-day conduct of the defendant in the matters set out above and other details, rather than upon the charge of undue interest in another man. The trouble between the parties and plaintiff's nervousness and loss of weight arose before the third party came upon the scene.

The plaintiff claims that the defendant's conduct caused her to become nervous and to lose weight. There seems also to be some thought that she became afflicted with eczema because of a nervous condition brought on by the defendant's mistreatment. But although she consulted physicians, there is no medical testimony, although the doctors were still in Des Moines and readily available. In fact, as to the eczema she says: "I consulted a skin specialist because I have an allergy to soap and water mostly and dust and nervous condition. * * * I gave up with the doctor and found something at the drugstore that seemed to help my hands and after I came out of the hospital I had absolutely nothing wrong with my hands. When I get nervous I get a little bit of skin trouble. * * * It is better now than it has ever been." This seems to eliminate any claim of danger to plaintiff's life from the skin trouble.

There is of course some conduct of a husband toward a wife which all the world can recognize as dangerous to her life. But when we are dealing with accusations of mental cruelty through verbal abuse, nagging, frequent complaining, or repeated criticisms, the line between conduct that is merely unpleasant and annoying on one hand and that endangers life on the other is often hard to draw. We think plaintiff's failure to call the doctors whom she consulted and whom she quotes militates somewhat against her. Renze v. Renze, 247 Iowa 25, 30, 31, 72 N.W.2d 490, 493; In re Estate of Ruedy, 245 Iowa 1307, 1312, 1313, 66 N.W.2d 387; In re Estate of Ransom, 244 Iowa 343, 373, 374, 57 N.W.2d 89, 106.

We do not commend the defendant's conduct. The record indicates that he was often arrogant, rude and inconsiderate of his wife's interests and feelings. He provided reasonably well for his family, and appears to be fond of his children and solicitous of their best interests. On the other hand, we are not convinced that the faults which disrupted the marriage are entirely his. He was by no means a paragon of marital virtue; but some defects must be overlooked on both sides if a marriage is to be a success. There is also the thought that a strong effort must be made to correct such defects. Toleration and sincere efforts to do better are essential to marital happiness.

The Iowa statute recognizes this. It does not permit the courts to grant divorces because of incompatibility. That the parties are unhappy together is likewise not a basis for divorce under our law. There must be something shown which evidences cruel and inhuman treatment, and that such treatment endangered the life of the party asking a divorce. Renze v. Renze, supra, 247 Iowa 25, 30, 72 N.W.2d 490, 492; Fisher v. Fisher, 243 Iowa 823, 827, 53 N.W.2d 762, 765; White v. White, 200 Iowa 779, 781, 205 N.W. 305, 306. We said in Hylarides v. Hylarides, supra (247 Iowa at page 841), that the language of our statute concerning cruel and inhuman treatment such as to endanger life "may have been originally intended to be strictly construed to mean conduct threatening immediate violent extinction." But over the years this construction has given way to an interpretation by the courts that physical violence is not required. We have recognized that there may be conduct endangering life even

though it is not evidenced by active physical abuse or danger of immediate death. In so doing, however, we have created for the court the serious problem of drawing the line between the ordinary wear and tear of family relations, and conduct in the way of verbal abuse, name calling, nagging, quarreling, discourtesies and indignities of other kinds which, if long continued, becomes a real danger to the life of the aggrieved spouse. This problem has been solved in many ways in many cases.

We have found no case which seems to us to go so far in finding danger to life as we would be required to do in the one at bar in order to uphold the decree and judgment of the trial court. What quantum of verbal castigation, what measure of indignity, what weight of mental oppression amount to danger to life must be determined by the facts in each case as it arises. We do not find such weight of evidence here.

III. Plaintiff has cross-appealed, alleging insufficiency of the amounts awarded her for alimony and support of the children. In view of our holding above that she has failed to show herself entitled to a divorce her cross-appeal becomes moot and must be dismissed.—Reversed upon defendant's appeal; cross-appeal of plaintiff dismissed.

All JUSTICES concur.