VALERA M. CLOUGH, appellant, v. G. HERBERT CLOUGH, appellee.

No. 49226.

(Reported in 84 N.W.2d 16)

JUNE 26, 1957.

Clough & Clough, of Mason City, for appellant.

Boyle & Schuler, of Clear Lake, for appellee.

THOMPSON, J.—The plaintiff's case is bottomed upon that part of our divorce laws found in section 598.8, subsection 5, of the Code of 1954. We quote the applicable section and subsection herewith:

"598.8 Causes.

"Divorces from the bonds of matrimony may be decreed against the husband for the following causes: * * *

"5. When he is guilty of such inhuman treatment as to endanger the life of his wife."

I. This exact language in our divorce statutes is found in the Code of 1851 and has been a part of our law at all times since, with the exception of the period from January 24, 1855, to March 15, 1858. During all this time a tide of controversy has swirled around it. Few statutes have been the center of so much litigation; and to this date the courts are constantly concerned with disputes as to its application to particular facts that arise in marital relations. It is probable, as we said in Hylarides v. Hylarides, 247 Iowa 841, 842, 76 N.W.2d 779, that the language was "originally intended to be strictly construed to mean conduct threatening immediate violent extinction." But we long ago departed from that exact concept; and in so doing we opened

a vast field for controversy. Many years ago this court committed itself to the interpretation that inhuman treatment such as to endanger life might arise without physical violence. Hylarides v. Hylarides, supra, at page 847 of 247 Iowa, page 782 of 76 N.W.2d, and cases cited. This interpretation is sound; but it is evident, and is demonstrated by the multitude of cases which have arisen under it, that the way so opened is a wide one and distinctly lacking in guideposts or direction signs.

All this is but another way of saying that each case which is thought to come within the terms of the statute must depend upon its own facts. Wilson v. Wilson, 246 Iowa 792, 795, 68 N.W.2d 904; Fisher v. Fisher, 243 Iowa 823, 827, 53 N.W.2d 762. The burden is upon the plaintiff to establish her case—that is, to show such inhuman treatment as endangered her life, by a preponderance of the evidence. Record v. Record, 244 Iowa 743, 749, 57 N.W.2d 911; Murray v. Murray, 244 Iowa 548, 550, 57 N.W.2d 234. These are propositions thoroughly established in Iowa and are not in dispute here. Nor is there any doubt that divorce, under our law, is strictly statutory. Record v. Record, supra, page 746 of 244 Iowa, and cases cited.

II. It is not claimed in the case at bar that there was any serious physical violence, as the term is commonly understood. But the plaintiff thinks the record shows such inhuman treatment as to endanger her life, because of these matters, which we quote from her brief: "1. Appellee is guilty of sexual peculiarities or perversion. 2. Appellee encouraged his wife to go out socially with other men. 3. Appellee forced upon his wife the reading of literature on sex perversion. 4. Appellee has demonstrated unfitness as a father. 5. Appellee has tried to make a narcotic invalid of his wife. 6. Appellee is personally unclean. 7. Appellee has tried to regiment unnecessarily the life of his wife." We shall consider these as stated. The trial court was of the opinion that plaintiff had failed to prove by a preponderance of the evidence that any of these grounds, or all of them combined, totaled inhuman treatment which endangered the plaintiff's life.

The parties were married at Kirksville, Missouri, on December 22, 1940, at which time plaintiff was about 20 years of age and defendant 31. Each had been married and divorced

once before. The defendant was at the time an osteopathic physician and was on the teaching staff of the Kirksville College of Osteopathy. They resided in Kirksville about four years, when they removed to Clear Lake, Iowa, and defendant has since been engaged there in the practice of his profession. Four children were born to them. Two children were born while they lived at Kirksville: Naila and George. After they removed to Clear Lake two more daughters, Fara and Valeta Mae, were born. The only son, George, lived only a few years; so that at the time of the separation in 1955 and of the trial of this cause the three daughters were the only living children. The defendant seems to have been successful in his practice. At Clear Lake he became associated with an osteopathic clinic and has continued to practice his profession.

III. The first ground of plaintiff's complaint is based upon her contention that the defendant was guilty of repeated acts of masturbation. Fortunately we are spared the necessity of analyzing the evidence upon this question. We think the plaintiff is not in a position to urge it as a ground for divorce. She testifies: "Before Doctor Clough married me he told me he practiced masturbation. I knew that." The defendant also testifies to the same effect. The rule is thus stated in 27 C. J. S., Divorce, section 58, pages 607, 608: "Knowledge by complainant of the cause for divorce at the time the marriage was contracted is a bar to the suit."

In Williamson v. Williamson, 212 Ark. 12, 15, 204 S.W.2d 785, 787, the Arkansas Supreme Court stated the principle in these words: "* * * it is obvious that before the remarriage Mrs. Williamson was well aware of Mr. Williamson's bad habits. He continued to be guilty of indignities, cruelty and drunkenness after they remarried, but she cannot use these acts as grounds for divorce, because she knew of them in advance."

To the same effect are Kincaid v. Kincaid, 207 Miss. 692, 43 So.2d 108, 109, 15 A. L. R.2d 667; Rankin v. Rankin, Mo. App., 17 S.W.2d 381, 391; Caswell v. Caswell, 64 Vt. 557, 24 A. 988, 33 Am. St. Rep. 943; Amis on Divorce, section 158.

We ourselves have recognized the rule in Wilson v. Wilson, supra, 246 Iowa 792, 798, 68 N.W.2d 904, 907, where we said:

"While habitual drunkenness also may be material evidence

of inhuman treatment, it is also true that one who marries another who is a habitual drunkard with knowledge of that fact assumes the risk."

Much of the record and of plaintiff's brief and argument are taken up with the unpleasant relation of defendant's sexual aberrations in the respect above stated; but she was fully informed about this habit before marriage and cannot now complain.

IV. We turn next to the fifth statement of the matters which plaintiff believes entitle her to a divorce. This concerns the alleged attempts of the defendant to "make a narcotic invalid" of her. It appears that plaintiff for some years suffered considerable pain at times from two causes: cramps during her menstrual period, and severe migraine headaches. At such times the defendant, acting as her physician, resorted to morphine injections. After some years of these treatments, plaintiff was taken to the Wilden Clinic in Des Moines, where she testifies she was told she showed symptoms of withdrawal, that is, of becoming a narcotic addict. Even after that, she says, the defendant on occasion gave her injections. It is the defendant's testimony that he did not give her sufficient dosages long enough continued to make her an addict; and in this he is corroborated to some extent by Dr. J. J. Henderson, another osteopathic physician who was associated in the clinic at Clear Lake with the defendant.

Of course, a deliberate attempt by the defendant to make his wife a slave to the use of narcotics would be inhuman treatment of the lowest degree, and it would certainly endanger her life. But we are unable to say from the record that he had such an intention. It is admitted that he gave the morphine usually when the plaintiff was in severe pain, although it is contended there were other occasions. Some doubt apparently existed in the minds of appellant's counsel as to whether the claimed overdosage was deliberate or merely negligent miscalculation. We quote from plaintiff's brief and argument: "Whether by accident, by negligence or by wilfullness (sic) the appellant was doubtless brought close to or over the borderline of being a narcotic addict * * *." It is true that at other points counsel seem to urge that there was an element of wilfulness in the administer-

ing of the morphine, which was at times supplemented or replaced by barbiturates. But we share the doubt expressed above; that is to say, we think that the record fails to show by the greater weight of the evidence that, if too much morphine was administered, it was done with intent rather than by mistake.

Not all inhuman treatment endangers life; and it is also true that not all acts of one spouse which endanger the life of the other are inhuman. In the latter category come accidents and inadvertences, even unintentional negligences. The husband who drives the family automobile negligently and so endangers the life of his wife is not necessarily inhuman within the meaning of our statute. So here, if the defendant merely miscalculated the proper amount which the plaintiff could tolerate without becoming an addict, we cannot say he was acting inhumanly in the manner contemplated by our divorce law. Upon occasion a well-meaning friend does more harm than might be contrived by a malicious enemy; yet we cannot condemn his actions as inhuman. There is some evidence that the defendant was somewhat too free in administering morphine; but we are unable to say that in so doing he was acting intentionally or was guilty of more than a medical miscalculation. Our statute requires that one claiming a divorce under subsection 5, Code section 598.8, show that there was first, inhuman treatment, and second, that it was such as to endanger life. It is not sufficient to prove either of these elements without the other. "Inhuman", as used in the statute, has a connotation of intent or wilfulness, or at least of wanton indifference. There is no sufficient showing that, if too much morphine was administered—a point we do not decide—that it was done intentionally or in wanton disregard of plaintiff's health and life. The "inhuman treatment" required by the statute does not sufficiently appear.

V. It is claimed that the defendant encouraged the plaintiff to go out socially with other men. Her testimony is that he told her to go her way and he would go his, and suggested she go out to shows or dances or parties with other men. The defendant says that he told her only he would have no objection if she went to such places with certain specified men, whom both of them knew and of whom he approved. Neither claims that any real misconduct with other men was suggested. Perhaps

what was discussed was unconventional, but we are unable to agree that there was either inhuman treatment or danger to plaintiff's life at this point.

VI. Considerable stress is laid on the complaint of defendant's uncleanliness about his person. Plaintiff tells at some length of his failure to bathe and of offensive body odors. Her contention here is considerably weakened by her testimony, detailed with considerably more particularity than is usually divulged outside the conjugal bedroom, concerning the intimate marital relations of the parties. Here she says the defendant was not sufficiently affectionate. This detracts to a considerable extent from the contention that defendant's unpleasant smells arising from failure to bathe were highly objectionable to her. In any event, we are not prepared to say that personal uncleanliness is ground for divorce under the statute upon which this action is based. Without holding that under no circumstances could this be true, we think that generally the courts will do well to refrain from attempts to say how often either party to the marital relation should take a bath, or to measure offensive smells.

VII. Other complaints are that defendant forced upon his wife the reading of literature on sex perversion; that he has demonstrated unfitness as a father; and has attempted to regiment unnecessarily the plaintiff's life. It would not aid the decision of future cases or be helpful in understanding our determination of the one at bar to go into these matters in detail. Upon occasion, the defendant read aloud to plaintiff from Shakespeare, the Bible, the Reader's Digest, and other works; and it appears that he also read extracts from the Kinsey report and from a book by a medical authority entitled "Female Sex Perversion." The reading of the latter work was, plaintiff says, against her wishes. But we fail to find that this affected her health or endangered her life. The other items, of unfitness as a father and attempted regimentation of the life of the plaintiff, are not supported by the evidence to a degree from which the conclusion that his wife's life was endangered can reasonably be drawn.

VIII. It may be that it is plaintiff's contention that her husband's claimed encouragement for her to go out socially with

other men, his personal uncleanliness, his insistence upon reading to her of sex perversions, his unfitness as a father and his attempts to dictate the course of her life should be added together in determining whether there was such inhuman treatment as to meet the terms of the statute. Her own testimony is that she was made extremely nervous and her health deteriorated badly during her married life. Much of her testimony about the effect on her health concerned the alleged masturbation habit of the defendant. But we have pointed out that she may not now rely upon this as a ground for divorce. It would be necessary for her to show that the items other than masturbation and giving her narcotics were inhuman and endangered her life. On this the record is meager. As to the question of the effect of his physical uncleanliness on her health and well-being, she said: "It is very disturbing, wears me down, I can't cope with it." The same question as to the effect of the defendant's claimed encouragement to go out with other men elicited this:

"Well, it has been most difficult to handle mentally and emotionally. In the first place I wasn't brought up that way and in the second place I don't understand his attitude in the second place. Why would he marry me if he didn't want me as his wife? * * * that wore on me mentally and physically, spiritually. I doubted marriage, I doubted religion, I doubted my training. It was rather rough, and finally I said 'I can't take it any longer, if we are not going to solve our problems I must get out of it.'"

After telling of her good health before marriage, she told of its deterioration afterward. She attributes her headaches to "emotional control when he would ignore me for so long, or contradict me, or made me feel bad, appear stupid in front of people. I wouldn't want to cry. I think it was holding back the tears that would build up the pressure in my head * * *. At the beginning of the attack it would last only a few hours but as the emotional strain got more I tried to withhold my feelings more in my confusion and the trouble got worse."

The plaintiff is corroborated as to her physical condition only by her mother. There is no medical testimony, although she had consulted physicians other than her husband and his

associates. We are left to conjecture as to whether her own analysis of the cause of the headaches has a medical basis. We think little weight should be given to the testimony of the plaintiff and her mother that the change in her appearance and her physical condition during her married life was due to some inhuman treatment by the defendant. It is not to be expected that fifteen years will pass over the head of anyone without leaving their imprint. In addition, the plaintiff had, not long before the trial, been involved in a serious automobile accident in which she received' a broken neck. She was wearing a neck brace at the time of the trial. Such an injury must have affected her health and appearance, to an appreciable degree.

■ IX. No citation of authority is required for the rule that in equity cases where the evidence is in contradiction and the credibility of the witnesses is important, we give weight to the fact findings of the trial court. The learned court here went into the evidence at length. It said:

"Because of the utter improbability of many of the charges made by the plaintiff, the unreasonableness of many of the conclusions at which she arrived from comparatively minor incidents, *together with her own conduct and attitude on the witness stand and in the courtroom during the trial,* the Court must discount most seriously many of the charges testified to by her and many of the conclusions drawn by her from facts which are not in dispute." (Italics supplied.)

The emphasized portion of the above quotation illustrates the reason weight is given to the findings of the trial court. It has the opportunity to observe many things which the printed pages of the record do not offer to us.

The court was also of the opinion that there was a serious question whether plaintiff's action was brought in good faith. It appears that a few years before the divorce action was commenced plaintiff became interested in the study of "dianoetics" which she describes as a "poor man's psychiatry." At another point she termed it "the study of man; what makes him tick." She traveled about considerably in her study of this subject, and finally reached a point in her knowledge and skill where she was given the designation of "Auditor." Her interest in this

study during the later years of her married life and at the time of the trial was quite evidently intense, and the trial court thought that at least to some extent it brought about her decision to seek a divorce. In fact, at one point in her cross-examination, when a long extract from a treatise by one L. Ron Hubbard, the founder or at least a leader in the cult had been read to her, she was asked:

"Q. You have read that passage many times before, haven't you, Mrs. Clough? A. Yes, and that is why I am asking for a divorce because I have had it for fifteen years."

It would not be fair to say that the record shows this was the sole reason for the divorce action; but in view of the fact that she had suffered the indignities of which she complains for nearly fifteen years, that admittedly many of them had lessened as time went by, and that she had voluntarily traveled about with male members of the cult and held frequent consultations with one of them who resided in Clear Lake, we must agree that some doubt arises whether it was altogether the purported misdeeds of her husband that motivated the divorce action.

■■ In any event, giving weight to the findings of the trial court and in view of our own analysis of the record, we conclude that plaintiff has failed to establish inhuman conduct of the defendant which endangered her life. Undoubtedly, the defendant has been far from the ideal husband. We have no idea of approving many of his acts and omissions. But the legislature has defined the grounds for divorce in Iowa. It has refused to enact that divorces may be granted because of marital misunderstandings or quarrels, or because the parties are not compatible or are not happy in living together, or because one or both may see greener fields far away. The courts must take the statute as it is.

It has not been practicable to discuss all the evidence in a record containing 581 pages, or all the contentions of the respective parties. We have, however, referred to all the claims which have substance. We agree with the decision of the trial court.—Affirmed.

All Justices concur.