HARRY N. McMURRAY, appellant, v. NORMA E. McMURRAY, cross-appellant.

No. 51158.

(Reported in 126 N.W.2d 336)

FEBRUARY 11, 1964.

Dailey, Dailey & Peterson, of Burlington, for plaintiff-appellant.

C. T. Cline, of Burlington, for defendant-cross-appellant.

LARSON, J.—The sea of matrimony can become a hazardous place when the parties fail to place mutual obligations above individual ambitions and desires. This case seems to illustrate the difficulties that may be encountered by well-meaning persons who forget those paramount obligations. Far too often in modern day society each party strives to succeed in his separate world and feels he has done his part when accomplishing that purpose. Too often when one or the other fails to perform his individual tasks to the satisfaction of the other, the cause is not jointly explored, advice is offered without actual help, and a breach widens between the parties which may well destroy the hopes and dreams of both. Such neglect, as regrettable as it may be, is not a ground for divorce in this state.

With high hopes for the future, the plaintiff and defendant,

both college graduates, were married at Mattoon, Illinois, on August 12, 1950. Plaintiff decided to become a general practitioner of medicine and, after his graduation from the University of Illinois medical school in June 1952, and a year's internship in Des Moines, he moved his wife and baby to Burlington, Iowa, where he established a large and successful medical practice. On July 23, 1960, he filed his petition for divorce against defendant on the statutory ground of cruel and inhuman treatment and asked custody of the parties' three minor children. Defendant answered and counterclaimed for divorce on the same ground and also asked custody of the children. The trial court found neither party had established a case by a preponderance of the evidence and dismissed both petitions at plaintiff's cost, which included a $1000 attorney fee for defendant's attorney. The court made no finding as to child custody, alimony or property rights. Both parties appeal. After a careful study of the record, we conclude the trial court's decision was right.

I. The general rules applicable to such cases are so well established that they need no reference to authorities and scarcely need repeating. To entitle a party to relief under the statute (section 598.8(5)) it is necessary that he prove by a preponderance of the evidence that the treatment administered was cruel and inhuman and that it did endanger his life. Howe v. Howe, 255 Iowa 280, 282, 122 N.W.2d 348, 349; Peitersen v. Peitersen, 253 Iowa 893, 895, 114 N.W.2d 299, 300, and citations; Phillips v. Phillips, 251 Iowa 1310, 1312, 104 N.W.2d 832, 833.

Of course "cruel and inhuman" treatment may be administered even though there is no physical mistreatment. Bowles v. Bowles, 248 Iowa 930, 81 N.W.2d 15; Cimijotti v. Cimijotti, 255 Iowa 77, 121 N.W.2d 537.

It is also well established that life may be endangered by mistreatment which impairs the health of the spouse. Rasmussen v. Rasmussen, 252 Iowa 414, 420, 107 N.W.2d 114, 118; Peitersen v. Peitersen and Howe v. Howe, both supra. Mental cruelty, we have said, will suffice. Hylarides v. Hylarides, 247 Iowa 841, 842, 76 N.W.2d 779. If the danger is such as would

reasonably be apprehended, we have held the danger to life is sufficient. Weatherill v. Weatherill, 238 Iowa 169, 187, 25 N.W.2d 336, 346; Phillips v. Phillips, supra.

Thus, if the evidence fails to show any deliberate misconduct persisted in by either party which would have the effect of impairing the health of the spouse, neither should be granted a divorce. On the other hand, had such been established as the principal cause of ill health under Kovar v. Kovar, 237 Iowa 251, 273, 21 N.W.2d 534, it would have been good cause within the intent of the statute. However, it must also be remembered that "not all acts of one spouse which endanger the life of the other are inhuman. In the latter category come accidents and inadvertences, even unintentional negligences." Clough v. Clough, 248 Iowa 1090, 1095, 84 N.W.2d 16. Granting that the evidence submitted here discloses negligence, we must agree with the trial court that it fails to show a deliberate course of misconduct persisted in by either party with the purpose to upset and worry the spouse. That both parties suffered mental distress and that it affected their health cannot be doubted, but the record is lacking in evidence that either acted deliberately to hurt the other except in one instance, to which we shall later refer.

II. Plaintiff's complaint is that defendant failed to keep the house tidy and clean, failed to do regularly and properly the household chores such as laundry, meal preparation, and dishwashing, failed to keep herself well-groomed and appropriately dressed, failed to properly care for their very young children, and that she nagged and wrongfully accused him of associating with other women.

There is substantial evidence that defendant did not perform well her housekeeping duties. In fact, she admits it. It is clear that she was never a very good housekeeper and that she became worse after the third and fourth children came. It appears under conditions not entirely of her own making, even with a cleaning lady and some other hired help, she failed to keep the children, herself, and the house tidy and well organized. There was ample evidence the house often (at least 50 percent of the time) was cluttered with soiled clothing, food,

toys, and other debris, and that the laundry was not done regularly and piled up in dressers, closets and in the laundry room. But there is little or no evidence these failures on the part of the defendant amounted to misconduct deliberately done to harass the plaintiff. Rather it seems these failures came about because of her incompetency and inadequacy; that due to plaintiff's continued absence from the home she felt neglected and so alone that she simply was unable to cope with the housework and give the four small children the care and supervision desirable and proper. She became a dreamer and read a great deal.

It appears that plaintiff failed to assist defendant perform household tasks in any substantial manner, and that he completely neglected to do so during the last two or three years before they separated. True, the record shows his professional duties had made greater and greater demands upon his time, but it also shows that as his patients became more numerous, his patience with his wife's inadequacies became shorter. He sharply criticized and berated her about these conditions and belittled her effort to meet her problems. Obviously, unless he obtained help in his medical profession, he had no time to help her, but unfortunately he also showed no desire to personally assist her solve the family problems.

Intent on establishing a successful practice of medicine in Burlington, plaintiff concentrated on that task alone, and succeeded in less than six years. From a practice in 1954 which required some 50 to 60 hours a week, he increased it until it required from 80 to 110 hours per week. His income increased accordingly until he netted some $22,000 or $23,000 per year. His gross take in 1960 was $53,300. During this period he had two separate associates. Each left for further schooling. When the first left, he was alone about two months; the second, about fourteen months. He admitted the work was too much for one man, but he would not take on an associate until he found the right man. When plaintiff tried to do the work of two men, the result was that defendant suffered a further loss of her husband's presence and companionship. Their social life became nil, for more often than not plaintiff did not come home until 10:30 p.m. or later. Understandably, her courage failed, she

could not get her work done, and as a result of her frustration she was twice confined in the hospital for what was called a nervous breakdown, once for four weeks in 1958, and once in 1959.

It is true plaintiff generously shared his increased income with his family. From a modest home on Gunnison Street in 1954 they moved to a new $25,000 home on Clearview Drive in January 1956. He provided his wife with a car of her own and $400 to $500 per month for clothes and household expenses such as water, fuel, light, and cleaning. He carried over $70,000 worth of life insurance for them. As to financial support there was no neglect on his part. Obviously, that did not solve her problems and did not result in a happy married life. That alone seldom is enough. Plaintiff's greatest error in these years, it seems, was that he expected defendant to bear the children, rear and care for them by herself, and to run a home for him which would meet his standard of excellency. In addition to Nancy Evelyn born in Des Moines September 19, 1952, Daniel Edward and Patricia Irene were born while they resided on Gunnison Street November 18, 1954, and November 5, 1955, respectively. Margaret Ann was born July 13, 1957, after they moved into the new home in January 1956. Perhaps it is too much to expect perfection when a woman bears four children in less than five years and solely assumes the task of caring for these babies. At least, failure to meet such expectation cannot be labeled misconduct regardless of the effect it may have upon a disappointed spouse.

Nevertheless, under these circumstances it is little wonder that each party became confused, upset and disorganized. Each needed the kindness, sympathy and loving understanding of his mate. Under such conditions disappointments are usually not well accepted. Plaintiff voiced his by criticizing defendant's efforts, and defendant voiced hers by accusing plaintiff of having an interest in another woman because he spent so little time with her and gave her no moral or physical support. No physical abuse of the plaintiff was shown, but due to the effect of these conflicting conditions he felt ill and sought medical advice. In an effort to overcome his nervous condition he also absented

himself from the home from late in November 1959 until July 5, 1960. The cause and effect of his distress is clear, but there is no substantial evidence that defendant's inadequacies amounted to willful harassment or that she deliberately acted to injure him. The underlying fault was not hers.

While unjust charges of adultery or infidelity are acts of cruelty and may so affect a spouse as to justify a divorce (Bowles v. Bowles, supra, 248 Iowa 930, 935), the evidence here falls far short of that necessary for a decree of divorce. Defendant's inquiries did not amount to such a charge, his explanations were accepted, and the accusations did not disturb him greatly. Indeed, with a little forethought he could have avoided the suspicious circumstances which could reasonably have caused defendant's concern that she might be losing her husband.

We find also no merit in the contention that defendant's neglect of the children so worried plaintiff that he was entitled to a divorce. While there is some authority for the proposition that cruelty to one's children, with a purpose of causing the spouse great concern and anxiety, is grounds for divorce (Wright v. Wright, English Court of Appeal, 1960, Prob. 85, 1 All Eng. 678, 82 A. L. R.2d 1352), this record falls far short of proof that defendant was cruel or inhuman to the children or that her neglect of them had a purpose to harass plaintiff. See 17 Am. Jur., Divorce and Separation, section 78, page 306. On the contrary it appears defendant loved her children and did not wish to neglect them. One of plaintiff's principal witnesses, Astrid Kopriva, said on cross-examination, "I felt she did the best job that she could in taking care of the home and of the family." On direct examination she had testified, "She loves her children, that's for sure, and she took care of them the best she could." In spite of her inadequacies, the children's health was generally good. We are satisfied defendant's inability to keep a tidy, clean and well-kept home, and to give the four babies the attention and care plaintiff desired, or her voiced concern about losing her husband does not supply the necessary grounds for divorce in this matter. Plaintiff's petition was rightly dismissed.

III. Defendant's case against plaintiff appears much

stronger, although she apparently was not too eager for a decree in her favor. True, the petition, which has not been dismissed, asks for divorce, but it was the trial court's opinion, after seeing and hearing the witness, that she would prefer the present status. During her testimony she volunteered the statement, "I don't really want a divorce I think. That is what is wrong with me. I don't know if I want one or not."

We note that several attempts to get these parties together have failed, but it is our hope they will give it one more try before attempting a legal separation on other grounds. While it may well be that these parties will never again live happily together as husband and wife, and certainly we cannot make them do so, we are sure there has been no such breach of faith between Harry McMurray and Norma McMurray that it cannot be resolved if each will admit his or her mistakes and work together to rectify them. If the doctor would limit his practice by obtaining sufficient assistance or otherwise, if he would actually help defendant about the house and with the children, and if he would provide her obviously-needed moral support and join her in occasional social activities, we think the results would be both beneficial and pleasant. On the other hand, if defendant would extend her efforts to provide a clean, tidy and well-organized home, give detailed attention to the needs of the children, and look her loveliest for plaintiff, his gripes might well turn to compliments and he might develop a desire and find a way to spend more time at home with his family.

IV. It would do little good to recite the evidence defendant relies upon for a decree in her favor. It is sufficient to say that the physical abuse (an occasional slap or shove) shown was insignificant and did not tend to affect defendant's health. It is true plaintiff's complaints as to her care of the home and the children worried defendant and caused her great nervousness. This is especially true as to a moving picture he took of the shabby condition inside the house shortly before she was hospitalized for a nervous condition. This came close to misconduct, for it inferred public exposure and ridicule. However, defendant herself admitted the complaints were justified. She admitted the housework often got completely out of hand and that in her

discouragement she could not cope with it. She was sorry that she failed to live up to her husband's expectations or do her duty to the family, but said without his help she could not do it. She broke under the strain. He did not, but no doubt suffered as much as she. Nevertheless, we are satisfied that in no case up until July 4, 1960, does it appear that he intentionally hurt or distressed her. Until that time he was trying to accomplish a right thing in a wrong way, i.e., to get her to perform as he believed a perfect housewife and mother should. Loss of companionship, of a husband's admiration, love and respect, of course, is a terrible thing for most wives, but it does not justify an abandonment of a wife's duties as a mother and housekeeper. She must realize that now, but has not yet resolved it would be best to go on without him.

The tragic death of little Danny by drowning while visiting at the home of defendant's mother July 4, 1960, did nothing to bring these distressed parties together. Instead of tender kindness and sympathy at the loss of *their* boy, plaintiff blamed defendant for his death and exhibited a behavior toward her which might well be held as extreme cruelty. We shall not relate these morbid events, for we cannot believe a rational person would willfully treat his spouse so despicably at such a distressing time. We prefer to believe this loss caused him to say and do things he did not mean. While defendant contends that displayed attitude has not changed, because the answer to her counterclaim still accuses her of gross neglect, we have a feeling that he must now realize this unfortunate accident was not her fault, that it was not gross negligence for her to develop a headache and to take a nap with the baby at that time. Certainly it was not gross negligence to allow her mother and sister to look after the children at this reunion at grandmother's home. It appears they were unaware the boy Danny had slipped away from the others, went to the nearby pond, fell in, and was drowned. If there was any neglect it was not defendant's and she deserved no such berating.

Defendant apparently did not believe plaintiff meant what he said and did, or she was in shock herself, for she survived the treatment without any further nervous disorder. At least, there

was no showing of the detrimental effect of that abuse, and we do not feel we should disturb the trial court's order also dismissing her petition for divorce.

V. Divorce actions are triable de novo, but here especially we have every reason to apply the rule that the findings of the trial court are entitled to much weight. Fisher v. Fisher, 243 Iowa 823, 827, 53 N.W.2d 762, and citations. In denying a divorce to either party on the grounds alleged, the trial court provided that plaintiff must pay the costs including a $1000 fee for defendant's attorney. Costs of this appeal shall also be assessed to plaintiff, with an additional fee for defendant's attorney in the sum of $500.—Affirmed.

All JUSTICES concur.